IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **Charles A. Wynn,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No.**  13-cv-665-CJP[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff  Charles A. Wynn is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB).

### **Procedural History**

Plaintiff applied for benefits in June, 2010, alleging disability beginning on May 15, 2007. (Tr. 23). After holding an evidentiary hearing, ALJ James E. Craig denied the application for benefits in a decision dated February 23, 2012.  (Tr. 22-39). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this court.

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 27.

**<u>Issues Raised by Plaintiff</u>**

Plaintiff raises the following points:

1. The ALJ failed to properly assess the treating physician opinion evidence.

2. The ALJ failed to analyze the combined impact of plaintiff's impairments.

3. The ALJ did not properly evaluate plaintiff's migraine headaches.

4. The ALJ's numerous credibility errors require remand.

**<u>Applicable Legal Standards</u>**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, **649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*, **573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the

Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7ᵗʰ Cir. 1984).** *See also Zurawski v. Halter*, **245 F.3d 881, 886 (7ᵗʰ Cir. 2001)**(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,** *Books v. Chater*, **91 F.3d 972, 977-78 (7ᵗʰ Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7ᵗʰ Cir. 1995)**).  This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **91 S. Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of

4

the ALJ.  *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Craig followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since the date of his application. He found that plaintiff had severe impairments of an old right cerebral infarct with residual drift in the left arm, right P2 segment posterior cerebral artery aneurysm, low back pain secondary to degenerative disk disease, left knee medial meniscus tear, status-post arthroscopic partial medial meniscectomy, degenerative arthritis, specifically medial gonarthrosis, chronic obstructive pulmonary disease (COPD), and depression and anxiety, The ALJ further determined these impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary level, with physical and mental limitations. Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff was not able to do his past work. However, he was not disabled because he was able to do other jobs which exist in significant numbers in the regional and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Workers' Compensation Form**

Plaintiff made a workers' compensation claim for his left knee injury which occurred on May 15, 2007. The claim was settled in May, 2010 for a total of $99,330.00. (Tr. 146-48).

**2. Agency Forms**

Plaintiff was born on February 18, 1964, and was 43 years old on the alleged onset date of May 15, 2007. He was insured for DIB through December 31, 2012. (Tr. 153). He completed the twelfth grade in school and has no specialized training. (Tr. 157-58). He previously worked as a farm laborer, repairer, appliance installer/servicer, and a ride operator. (Tr. 183).

In a Function Report submitted in August of 2010, plaintiff said he was unable to work due back and knee injuries. He said he needed a complete knee replacement. He also stated that he was unable to work due to a previous stroke and a brain aneurysm. (Tr. 172).

**3. Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing on January 26, 2012. (Tr. 52). He testified that he lived with his two sons that were thirteen and seven years old. (Tr. 53). His mother, aunt, and older daughter came by frequently to help around the house. His wife had not been around for about three

years. (Tr. 58). He received food stamps and had a state medical card. (Tr. 54). His workers' compensation claim was settled two years earlier and he was no longer receiving its benefits. (Tr. 53-54).

Plaintiff testified to being tired, having shortness of breath, and uncomfortable eye pressure and pain due to his aneurysm. (Tr. 55). He stated his hands go numb and he has trouble with his grip. The weather made a difference in how he felt and was particularly tough on his knees. (Tr. 56). Plaintiff's knee problems caused him to fall and stumble at times so he used a cane if he had to walk a distance or get around crowds. (Tr. 57). He needed to have a knee replacement. (Tr. 67).

He had migraines anywhere from three to seven times a week that could last for a few hours. His migraines would get worse with noise or continuous activity. (Tr. 62). After plaintiff had a stroke, his hearing loss became worse and he had trouble with depression and anxiety. (Tr. 63-64). He had issues with his memory and without the help of his family he did not feel he could independently take care of his children. (Tr. 65-66).  He had to take frequent breaks and could not focus on things for long before having another migraine. (Tr. 71).

Plaintiff's doctors recommended surgery on his knee and his aneurysm. He was reluctant to have surgery as his father passed away on an operating table and the doctors never said he could return to work if the surgeries were successful. (Tr. 73-74).

A vocational expert (VE) also testified. The VE found that plaintiff's past work as a mechanic was classified as skilled work in the heavy exertional level. His work as a ride operator was considered semi-skilled in the light exertional level. His work as an appliance installer was considered skilled work on the medium exertional level. (Tr. 75).

The ALJ asked the VE a hypothetical where she was to assume a person with plaintiff's vocational and educational background, limited to sedentary work, using a cane to walk, occasional crouching, stooping, kneeling, or crawling, and no exposure to weather or extreme cold. Hearing would be no greater than required in his past work and there could be no exposure to moving mechanical parts, no exposure to noxious fumes or odors, no detailed or complex work, and occasional contact with supervisors, the general public, and coworkers. (Tr. 75). The VE testified that this person could not perform any of plaintiff's past work. However, he could perform jobs with a restricted range of sedentary work that exist in a significant number in the national economy. Examples of such jobs are clerical addresser, security monitor, and small products sorter. (Tr. 76).

The VE testified that if the individual had to leave his work station two or three times a day to sit away from his work area, he missed three days a month on a regular basis, or he could not perform work more than six out of eight hours a day, he could not perform the jobs listed above. (Tr. 76). He would also be unable to perform the jobs above if he was limited to sedentary work but could only sit

for three hours total with a ten minute break every hour and could only stand or walk for a total of three hours in an eight hour day. (Tr. 77).

### 4. Medical Treatment

Plaintiff had a history of left knee problems and an orthopedist recommended surgery in January of 2007. (Tr. 284, 323-25). He sustained an injury at work in May of 2007 that resulted in a torn meniscus on his left knee and tenderness in his hip and low back. (Tr. 341-48). In May of 2008, plaintiff underwent surgery to repair his medial meniscus tear. (Tr. 289-90). For several months after the surgery plaintiff returned to the orthopedist to have excessive fluid drained from his knee. (Tr. 295-97, 304).

Plaintiff saw Dr. Golz to determine the cause of the returning fluid and it was discovered he had degenerative changes causing the knee to be almost bone on bone. (Tr. 300-02). While Dr. Golz initially suggested unicompartmental knee replacement, he later advised plaintiff that a total knee replacement would be his best chance for a long-term solution. (Tr. 304-10). Plaintiff continually did not want to pursue a total knee replacement and mentioned wanting "one surgery that would be lasting." (Tr. 309, 311). Dr. Golz noted that because this was a workers' compensation claim at the time, he did not feel plaintiff was entirely disabled. (tr. 305). He outlined the following restrictions for work, no heavy lifting, no prolonged standing for more than an hour at a time, no more than six hours a day, no climbing, kneeling, crawling, repeated bending, stooping, squatting, continual standing, walking, or stairs. (Tr. 306).

Plaintiff regularly saw multiple doctors from 2006-2010 complaining of knee, back, and hip pain.  (Tr. 287, 319, 321, 344-48). He saw a neurosurgeon, Dr. Fonn, for his lower back pain in 2009. Dr. Fonn diagnosed plaintiff with L4 radiculopathy secondary to L3-4, L4-5 disk bulges, and L4 neuroforaminal stenosis. He recommended physical therapy and prescribed Norco for pain relief. (Tr. 358). When plaintiff felt physical therapy was not helpful, Dr. Fonn recommended epidural injections. Dr. Fonn opined plaintiff should not go back to work as he was not at "maximum medical improvement." (Tr. 357).

In December, 2009, plaintiff saw his primary physician, Dr. Fozard, for left sided paresthesia, passing out, vomiting, and tingling on his left hand, flank and leg. (Tr. 316-18). Plaintiff had a CT scan and an MRI of his brain which revealed an old right cerebellar infarct and an aneurysm. (Tr. 327-29). He also had an MRA done which showed moderate to moderately severe focal stenosis of the middle cerebral artery and 50% stenosis of the basilar artery. (Tr. 326).

In February, 2010 plaintiff first saw Dr. Caragine, Director of Cerebrovascular and Endovascular Neurosurgery, for treatment of his stroke and aneurysm. (Tr. 372-73). Dr. Caragine initially felt the aneurysm was in a difficult position for surgery but that it could be treated endovascularly. (Tr. 463-464). He noted plaintiff was at an increased risk for complications from anesthesia but that the complication rate would definitely be under 10%. (Tr. 365, 371, 464). Plaintiff decided not to pursue any procedures at that time. (Tr. 464).

Plaintiff followed up with Dr. Caragine in August 2011. Dr. Caragine felt plaintiff recovered well with just a tiny bit of residual drift in his left arm. He strongly recommended treating the aneurysm and opined that in five years the aneurysm had a 2.5% rupture rate, in ten years a 5% rupture rate, and in twenty years a 10% rupture rate. He told plaintiff he previously treated hundreds of aneurysms and there was a 95-97% chance plaintiff would have no complications from a surgery. Plaintiff still refused any surgery and instead chose to regularly monitor the aneurysm. (Tr. 461).

In 2011, plaintiff saw Dr. Fozard several times and complained of headaches and vision problems. Plaintiff said he had headaches several times a week and was taking hydrocodone to help with the pain. He was scheduled to see a neurosurgeon in July for treatment. (Tr. 451-56).

**5. Dr. Fozard's Opinion**

In January, 2011, Dr. Fozard conducted a psychiatric report at the Social Security Administration's request. He noted the plaintiff was seen every 6-8 weeks since 2004.  His exam showed plaintiff had relevant and coherent speech, logical thought process, and adequate memory. He reported adequate abstract thinking, and that plaintiff had no serious limitations with completion of household duties, instructions, supervision, and work pressures. He also noted plaintiff had depression and anxiety. (Tr. 436-439).

On March 11, 2011, Dr. Fozard performed a mental residual functional capacity assessment where he opined plaintiff had only some limitations working

with detailed instructions, maintaining concentration and attention for extended periods of time, and completing a normal workday and workweek without interruptions from psychologically based symptoms. He also noted plaintiff had chronic anxiety, recurrent headaches, insomnia, vertigo, and a low frustration level. (Tr. 468-471).

Dr. Fozard also completed a physical medical source statement on March 11, 2011. He stated plaintiff should not lift significant amounts of weight due to dizziness, headaches, and back pain. He believed plaintiff could sit, stand, and walk for a total of three hours a day with a ten minute hourly break and, sit, stand, and walk for one hour each without interruption. Plaintiff could only tolerate moderate noise levels due to headaches and could not balance, stoop, kneel, crouch, or climb ladders, stairs, ramps, or scaffolds. He would require a nap after three hours of work due to insomnia, and could not be in environments with humidity, wetness, dust, fumes, odors, or pulmonary irritants. (Tr. 444-49).

### 6. Opinions of Consultative Examiner

Dr. Adrian Feinerman performed a physical consultative examination in October, 2010. Dr. Feinerman noted plaintiff's nine medications and discussed his myocardial infarction and cerebral aneurysm. He reported plaintiff's complaints of shortness of breath, his chest pain, dizziness, decreased hearing, heartburn, prostatic hyperplasia, and back and knee pain. He noted his ambulation seemed normal without an assistive device and "no pain in the weight bearing joints." He noted plaintiff had a decreased range of motion in his

shoulders but otherwise had normal muscle strength and no musculoskeletal abnormalities. Dr. Feinerman's diagnostic impression was hypertension, degenerative joint disease, chronic obstructive pulmonary disease, and lumbar disc disease. Plaintiff was able to sit, stand, walk, hear, and speak normally. Dr. Feinerman said plaintiff was able to lift, carry, and handle objects without difficulty. (Tr. 384-93).

**<u>Analysis</u>**

The Court turns first to plaintiff's challenge to the ALJ's credibility findings. ALJ Craig found plaintiff not credible in his statements regarding intensity, persistence, and limiting effects of his impairments.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, **556 F.3d 558, 562 (7th Cir. 2009)**. It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid*. See also, *Terry v. Astrue*, **580 F.3d 471, 478 (7th Cir. 2009)**(The ALJ "must justify the credibility finding with specific reasons supported by the record.") If the adverse credibility finding is premised on inconsistencies between plaintiff's

statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, **245 F.3d 881, 887 (7th Cir. 2001).**

The ALJ gave multiple reasons for his credibility determination, and plaintiff is wrong in stating he relied on significant physical and diagnostic examinations solely. However, the reasons given by the ALJ for rejecting plaintiff's credibility are not supported by the record and are not valid.

The Court agrees with plaintiff that the ALJ mischaracterized evidence with regard to plaintiff's medical history. While the ALJ undertook an extensive review of plaintiff's medical records he did not explain how he arrived at many of his findings. He stated that the absence of evidence of significant nerve root impingement, ongoing neurological abnormalities, or significant difficulties or erosion of the joints and bones were not consistent with the claimant's allegations of disabling levels of pain. (Tr. 32). However, the medical record shows plaintiff did have significant nerve root impingement in his back, ongoing neurological abnormalities with an aneurysm and stenosis in his brain, and significant difficulties with the erosion of his joints in his knees. (Tr, 358, 463-64. 473, 307-11). The ALJ should have explained his reasoning if he felt the evidence of these issues was diminished in the medical record.

The Commissioner notes that plaintiff cites records related to his knee surgery in support of significant joint abnormalities. The Commissioner infers that the ALJ did not err because plaintiff had good range of motion in his knee during some of his examinations in these records. However, the ALJ never states

that is why he chose to discount those conditions. He states there was an absence of evidence in support of those conditions, not a presence of evidence that discounts it. In advancing reasons not relied upon by the ALJ, the Commissioner violates the *Chenery* doctrine. See, *SEC v. Chenery Corporation*, **318 U.S. 80 (1943).** "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner v. Astrue*, **697 F.3d 642, 648 (7th Cir. 2012).**

Moreover, the Commissioner notes that the knee specialists reasoned plaintiff could do sedentary work, similar to the ALJ's RFC, and therefore the evidence supports the ALJ's RFC and undermines plaintiff's credibility. It is important to note that the specialists evaluated plaintiff before he had a stroke or his aneurysm was discovered. Additionally, as plaintiff points out, the ALJ also failed to even mention the neurosurgeon that examined plaintiff's back, Dr. Fonn, outside of his extensive overview of plaintiff's medical history. Dr. Fonn opined that plaintiff should be kept off of work as he was not at maximum medical improvement. (Tr. 357). The ALJ failed to mention this opinion in his credibility analysis or in weighing the varying doctor's opinions. The Commissioner notes there is no evidence that Dr. Fonn permanently kept plaintiff off of work, however the ALJ never states this is his reason for not considering Dr. Fonn's opinion in his analysis.

While the ALJ does not have to give this opinion significant weight, he does have to address the evidence that is not in support of his decision and give

reasoning for why it was discounted. The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting [his] ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, **743 F.3d 1118, 1123 (7th Cir. 2014)**. This rule is long-standing. See, *Myles v. Astrue*, **582 F.3d 672, 678 (7th Cir. 2009)**, and cases cited therein.

Plaintiff points out, and the Commissioner acknowledges, the ALJ misread and misstated medical records with regard to plaintiff's smoking habits and not taking a blood thinner. (Tr. 31). While this minor error may not change the outcome of the ALJ's opinion, it is evidence the ALJ misunderstood relevant portions of plaintiff's medical record.

The ALJ looked at plaintiff's usage of medications and determined he had not been prescribed "a lot of medications and those that had been prescribed had been beneficial." He also states there was "no indication" plaintiff sought out or required narcotics, steroids, pain medicines, anti-inflammatories, or psychiatric medications on a consistent, long term basis for pain relief or control of mental symptoms. (Tr. 34). The record is in direct opposition to this claim. Since 2007, plaintiff was prescribed anywhere from six to twelve medications. (Tr. 284, 299, 385-86, 480, 483, 486, 489).

Plaintiff was consistently prescribed significant pain medications, including narcotics, by several doctors. (Prescribed narcotics at Tr. 294, 314, 343, 346, 348, 358, 453; Prescribed pain medication for headaches at Tr. 481, 487, 491).

Dr. Fonn's records show plaintiff was recommended to receive epidural steroid injections for his back pain. (Tr. 357). He also received steroid injections in his knee. (Tr. 296, 345). From 2007 through 2012, the record shows multiple medications prescribed for his depression and anxiety. (Tr. 284, 317, 320, 322, 455, 474, 489). The Commissioner argued the portions of the record plaintiff refers to in his brief did not show a consistent and long-term basis for the need of medications. While this is accurate and plaintiff failed to cite several more occasions where medications were prescribed, this Court is not limited by what the plaintiff put in his brief, but rather what the record shows.

The ALJ found the course of medical treatment hurt plaintiff's credibility determination. However his analysis is not without error. First, the ALJ also stated that plaintiff's depression and anxiety were improved in May, 2011, but he fails to note that in December 2011 plaintiff's depression and anxiety medicines were no longer effective and were changed. (Tr. 35, 474). He then relies on Dr. Golz's opinion plaintiff was not entirely disabled but fails to note that this determination was made before his stroke or aneurysm occurred.

The ALJ relied heavily on the fact that plaintiff chose not to undergo surgery on both his knee and his aneurysm. While refusal of treatment can indicate a lack of credibility, the ALJ must consider plaintiff's reasoning for refusal in his analysis. "The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine

17

whether there are good reasons the individual does not seek medical treatment." S.S.R. 96-7p*

The ALJ fails to question or look to the record for the reasons plaintiff chose to not undergo the surgeries. Plaintiff sought a second opinion as to his knee surgery which was in conflict with the specialist on record. (Tr. 309). Additionally, when plaintiff was first informed of his brain aneurysm, Dr. Caragine opined that surgery could be difficult due to the placement of the aneurysm and that there were significant increased risks for plaintiff in particular. (Tr. 371). Later, Dr. Caragine determined it would be wise for plaintiff to undergo surgery to treat the aneurysm. Plaintiff was extremely concerned with the risks involved and chose to decline surgery at that time. (Tr. 464). The ALJ still may find plaintiff's reasoning for refusing treatment was inadequate. However, since he relied heavily on the fact that plaintiff refused treatment in his credibility determination, he must at least address why plaintiff chose not to pursue that course of treatment. *Craft v. Astrue*, **539 F.3d 668, 679 (7th Cir. 2008)** (stating that if an ALJ bases his credibility finding on a lack of treatment, the ALJ must explore the reasoning for the lack of treatment); *Virgil Shauger v. Astrue,* **675 F.3d 690, 696 (7th Cir. 2012)**(stating an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference).

The ALJ also takes note of plaintiff's work history. He states plaintiff had not attempted to return to work or look for other work. He claimed plaintiff had

not sought the aid of additional resources in looking for work. He noted plaintiff filed for and received workers' compensation and state benefits. From this information he opined plaintiff was no longer motivated to work or return to competitive work. However, the record does not show plaintiff had not sought additional resources or attempted to return to work. The ALJ makes this assumption, not by asking the plaintiff if he sought work, but by inferring it. It is possible plaintiff has not sought and is completely unmotivated to do any work. However, there is no evidence on record supporting this assumption and the ALJ's determination that plaintiff's was unmotivated due to pursuing a workers' compensation claim is in error.

The ALJ looked at plaintiff's activities of daily living. He noted plaintiff lived with two sons in a rural area with animals. He walked, occasionally grilled food, watched sports, and visited with his family members. The ALJ noted plaintiff's aunt's statements regarding his daily living which included fixing snacks, some cleaning, minor repairs, and attending his sons' sporting events. However, he also failed to mention that on this report his aunt noted that she, her sister, or plaintiff's wife helped with most of the household activities. (Tr. 164-71). The ALJ also fails to address plaintiff's mother's statements that she and his aunt were at his home to help with feeding the animals, cooking meals, and taking care of the children every day. (Tr. 202).

The 7th Circuit has repeatedly criticized ALJs for equating the ability to do a few daily activities with the ability to work. ***Roddy v. Astrue*, 705 F.3d 631**

(7th Cir. 2013); *Hughes v. Astrue*, **705 F.3d 276 (7th Cir. 2013).** Here, the record does not indicate plaintiff could complete a workday or workweek by the daily activities he undertakes. Additionally the case at hand is similar to a 7th Circuit case, *Hamilton v. Colvin*. **525 Fed. Appx. 433.** There, the ALJ failed to explain how isolated recreational events equated the claimant was able to do consistent work. *Ibid*. **at 438.** He merely mentioned activities the claimant undertook but failed to build a logical bridge. *Ibid*. Here, ALJ Craig fails to do the same. He simply recites some of plaintiff's daily activities without establishing how they equate to being able to complete a workday or workweek. (Tr. 36-7).

The ALJ is "required to build a logical bridge from the evidence to his conclusions." *Simila v. Astrue*, **573 F.3d 503, 516 (7th Cir. 2009).** ALJ Craig simply failed to do so here.  He did not adequately address evidence in opposition to his opinion, misstated the record, and failed to explain his conclusions on multiple instances. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Kastner v. Astrue*, **697 F.3d 642, 646 (7th Cir. 2012)., citing** *Steele v. Barnhart*, **290 F.3d 936, 940 (7th Cir. 2002).**

It is not necessary to address plaintiff's other points, but, as in *Pierce*, the determination of the weight to be given to Dr. Fozard's opinion and of plaintiff's RFC will require "a fresh look" after reconsideration of plaintiff's credibility. *Ibid.*

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that

he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

Plaintiff's motion for summary judgment (Doc. 18) is granted.

The Commissioner's final decision denying Charles A. Wynn's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:**        **September 29, 2014.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**